We'll go to the next case on the calendar. It is 23-969 United States v. Chamberlin. Good morning and may it please the Court. Hunter Haney with the Office of the Federal Public Defender for Richard Chamberlin. I'd like to reserve three minutes for rebuttal and I'll watch my clock. This appeal concerns three discrete sentencing guidelines issues. I'd like to pick up where the last case left off with the hate crime enhancement while it's fresh in everyone's mind before turning to the aggravated assault and, if time permits, the obstruction issue unless the Court prefers otherwise. I don't plan to rehash the points my colleague in the last argument already made about the hate crime enhancement's motive requirement, which we fully join unless the Court has questions, but I do want to highlight two reasons why Chamberlin should prevail even if the Court determines that animus isn't required under the enhancement contrary to the position the government took below in this particular case. So there are two narrower grounds under which the Court can resolve the case. First, it is uncontested that the District Court shifted the burden to Chamberlin of disproving the hate crime motivation enhancement. But regardless of the burden, I think that the Court in this case made a finding that this wasn't motivated by misogyny. Correct. That's right. Is that the second thing you were going to say? Yes, that is the second thing I was going to get to. What's your next argument? As to the hate crime enhancement? Oh, sorry. Go on. Yes, absolutely, Your Honor. So on the aggravated assault point, the District Court further erred by selecting the aggravated assault guideline for Chamberlin's FACE Act misdemeanor. A good portion of this argument has been conceded, and I think it's important to understand exactly what the Court still needs to resolve just to give a little bit of context as to how this guideline was – we got to this point. So to determine a counts offense guideline, Section 1B1.2 directs us to the statutory index. Under the index, Section 2H1.1 is the applicable guideline for a FACE Act misdemeanor. 2H1.1 then directs courts to apply the offense level from the offense guideline applicable to any underlying offense or an offense level of 10 if the offense involved a use or a threatened use of force, whichever is greater. And then in implying the 18-level aggravated assault guideline here, the District Court, at the government's urging, applied the definition of aggravated assault under Application Note 1, which defines aggravated assault as a felonious assault that involved A, a dangerous weapon with the intent to cause bodily injury, or C, an intent to commit another felony. Counsel, you spent a lot of time arguing that the situation we have here doesn't really fit as to aggravated assault. Correct, Your Honor. How does it fit as to simple assault? A client, I think, undisputably fired his weapon. It fits more naturally under the assault guideline. The most serious conduct under the simple assault involves, I think, threatened use of a weapon. Isn't that right? I'm sorry. I think I'm misunderstanding, Your Honor. Isn't the most serious conduct under the simple assault the threatened use of a weapon? Looking only to the specific offense characteristic, yes. I believe that's what Your Honor is referencing. Is that really a problem for your argument? No, it's not. I think under authorities, we've set forth in our briefing, it's common and courts have recognized that offense guidelines are not going to naturally exactly map on to every permutation. My point is just that that's true of both aggravated assault and simple assault. You're pointing out, I think, the problems with the aggravated assault analysis, but not embracing or refuting the problems with the simple assault analysis. That's what I'm inviting you to do. Yeah, so I think absolutely. I mean, I want to get into the Kaiser argument, if that's all right. So at a bare minimum here, we think that under Kaiser and Castillo, the guidelines text here unambiguously establishes that aggravated assault requires an intent to injure when a dangerous weapon is used. And in any event, the application at one is at least a reasonable interpretation of that guideline. So this is actually aligned with the position that the D.C. Circuit recently adopted with regard to application at one's intent to commit another felony clause, as we pointed out in our 28-J letter filed last week. It's consistent with the government's position in that case and other cases, and it's the right one, really. And we think that it does more naturally map on to the simple assault guideline if it maps on anything. But actually, the 10 here is what does apply, which is the threatened use of force or the use of force. Use of force? Correct, Your Honor. That is under 2H1.1. How does it constitute a threatened use of force? What's your best argument? Because this was a shooting toward a building that was at the government's, as the government is conceding and most reckless, the court, I believe, found implied malice in this case, which is not sufficient to meet the standard for aggravated assault. They've abandoned that argument. Yes, absolutely. One of the episodes that I think is in the record is shooting at a window that happened to be replaced by plexiglass, but there was a worker standing behind it, a clinic manager standing behind that window. Right. At most, that shows recklessness is the point, fundamentally, that we're making. And it was a use of force, I think, more naturally than a threatened use of force, absolutely. I would agree with that. I apologize, Your Honor, for taking so long to get to that. I want to make sure you have a chance to respond. There's another episode that I think is described as shooting and narrowly missing somebody who was outside the building. Do I remember that incorrectly? That's correct. There was a support companion sitting behind some banners as Chamberlain drove by. Not just shooting at a building. There was a person there. What's your argument as to that episode? So there's no indication that Chamberlain, in fact, the district court expressly found he was not aiming at anyone. That's at ER 141 to 42. And that finding isn't challenged. And rightfully so, because, as I mentioned, there were opaque poster boards in front of that person. There are photos of that in the record. At ER 3, I believe it's at, I'm sorry, ER 285, you can see the person. I thought there was a group of people, and I'm just shooting indiscriminately into the group of people. You could say I'm not aiming at anyone because I'm not aiming at any particular person. But I am shooting into a group of people. Yes. So that would seem to be New York. Why is that not the type of conduct that would count here? That is a use of force under 2H1.1. That's exactly what we're arguing, why the 10 would apply here rather than the 18 that was in effect. It was a major difference in this case, ultimately. Excuse me? Your answer to Judge Van Dyke's question is what? If the person we're shooting, this is a hypothetical, shooting into a crowd of people, but not aiming for any one person, your position is that would be a simple assault? That is a reckless use of force, yes. That would be a simple assault at best. It is best captured by 2A2.3. And in that case, the 10 would apply. In that situation, yeah. Could the judge make some kind of finding that would raise it above a reckless use? Yes, Your Honor. What kind of finding is required? It could seek under, I'm sorry, I believe it's 5K2.6, an upward departure for a reckless discharge of a weapon, applying the upward departure standard if there were exceptional circumstances, danger posed to civilians. It just seems like, you know, I guess it seems to me like I think a reckless discharge of a weapon is just shooting a gun randomly in a way that is dangerous and endangering. But shooting into a crowd of people, intentionally shooting into a crowd of people but not targeting an individual person just seems worse. Right. Intuitively worse. Sure. Like you actually are, like it's akin to shooting at a person. And I think the departure would be available in that circumstance. That's not what occurred here, obviously. We just had one individual. The reason I use that hypothetical is, I mean, when you're shooting at a building like this and you're shooting at windows, you're shooting where people are standing on the porch, it's really not that different. It's not then shooting into a crowd of people. It's just a more loosely packed crowd of people. I think with a crowd of people you're more likely to see that crowd of people than a single person sitting behind some opaque poster boards. And I think it's really careful. It's really important to emphasize here that Section 113, this court has most recently in its decision in Dat Kwok Do, a decision filed in our reply brief, that the assault statute, 113, is a comprehensive statute that Congress enacted. It's been around since the 1980s. And this court has consistently interpreted conduct, including in that very case, that involves shooting toward a car where civilians were inside, as covered only by, only it would be, I believe it's A5, 113A5, which is the equivalent of the simple assault. That is, it may ultimately not be the best policy. It may not be the policy that we, that your honors prefer, but I think that is ultimately a policy dispute that, you know, would need to be taken up with Congress. That's how the guideline has been interpreted as to reckless, you know, shootings as occurred here. Counsel, do you want to speak to the second enhancement, the obstruction of justice enhancement? Yes. So the court also erred in applying 3C1.1's obstruction enhancement based on unsworn offhand remarks that Chamberlain made to police following the federal arrest. Under 3C1.1, for a statement to... Forgive me for interrupting, but to focus you, you did just say offhand remarks, and we've got the transcript. How much of your argument depends upon this being an offhand remark? It depends on the prong of the analysis that, you know, we're discussing, Your Honor. There are multiple requirements for false statements to law enforcement. They have to be not only false but willful, material, and have a significant obstructive effect. Right. So which prong is it you're relying upon? Do you think these were not material? All of them. All of the prongs were. There were very few findings in this case, factually. The court really just addressed the governance. I didn't. I think we're not communicating very well. Sorry. Sorry, Your Honor. It's one thing for you to tell us that you think that there weren't adequate findings, but I was asking a different... I understand. Making a different point. Trying to get to that. Yeah, we're disputing all of the prongs because there was just insufficient evidence of willfulness, materiality, and significant obstructive effect. And I think, going back to Your Honor's first question, the offhand nature of these remarks goes primarily to willfulness. And in that case, as this court has explained, for a statement to be willfully obstructive, the speaker has to be consciously acting with the purpose of obstructing justice. And that did not occur here. Why not? Because the court expressly found that Chamberlain attempted to give up his weapons and follow through with his legal obligations at all times. At ER, 28 to 20 died. These informal post-arrest remarks that were made one time immediately after arrest again... Informal? I'm sorry. Informal what? Remarks that he made to police. What did you say? Something-esque remarks? I just couldn't hear you. Offhand. I said... Post-arrest. Post-arrest. Excuse me. Which the commentary recognizes as a particularly suspect type of statement to make an obstruction finding on because it involves often the assertion of constitutional rights. These remarks, even if they're deemed false by the court, they could not supersede, ultimately, his demonstrated pattern of complying with what the justice system had asked of him following the incidents in this case. So willfulness is not made out. We also think that there is no materiality shown in this case. A material statement is one that, if believed, would tend to influence or affect the issue under determination. And these, again, informal offhand remarks... How does materiality work? Because that seems to me to be... It doesn't seem to have affected much here, these statements, even if we assume, for the sake of argument, that these statements were, you know, he was trying to fib a little bit and mislead them. It doesn't seem to have done much. So is materiality from the standpoint of what he was expecting the statements to accomplish or... I'm sorry. I'm taking a... Not at all. Or is materiality an actual... Like, did it actually affect anything? How do we analyze materiality? Your Honor, I see that I've exceeded my time, if I may answer the question. No, go right ahead. So it's a question of, if the statements are believed, would they affect... Do they tend to influence or affect the issue that's under determination? The reason it's framed that way is because, if the law enforcement didn't believe them, it still could be attempting to. It still could be obstructing. It still could be fit as obstruction because he was attempting to do it, and if they'd been believed, it may have worked. I think so. I think so. But we ultimately hear what we have is statements that played no role in the charging decision. They're, again, after... Because the gun he got cited, he got charged for, was the one that they found in his car. Is that the one that was actually the basis for the... This was a plea, if I'm right. Yes. So the actual charge was based on the gun that was found in his car. None of these guns? I believe so, Your Honor. We can ask the government about that. Yes. Are you familiar with the Arlofton decision? Arlofton? Lofton? Yes. I believe that was a predecessor case to Taylor, the case that Your Honor was on. Wire fraud case. I'm not familiar with the facts. He continued to commit wire fraud from his cell. I'm going to paraphrase. But just going back to Judge Van Dyke's question about what is required by way of obstruction on the back end. In that case, we found there was obstruction, continuing obstruction, because the defendant continued to engage in his wire fraud from his jail cell, and that required revising of PSR. Here you have no... It didn't take much. Yes, absolutely. But here you have nothing like continuing conduct. You have a single set of remarks. If we agree with you, should we remand for findings? At the very least, Your Honor, we're asking that Your Honors affirmatively find that the enhancement does not apply, but in the alternative, we do think that the lack of findings here as to several of these elements warrants at least vacature of the enhancement. Thank you for my... Don't run away quite yet. Judge Toshima, do you have other questions, Judge Van Dyke? All right. Counsel, when you come back, we'll put a couple minutes on the clock for you. We took a lot of your time. Thank you, Your Honor. Not at all. May it please the Court, Ilana Artson on behalf of the United States. Let me start with the hate crime enhancement. As my colleague, Mr. Alden, argued in the prior case, the language of this provision in the guidelines only requires intentional selection of the victim because of the protected characteristic. It does not require animus toward that protected characteristic. Now, we agree that the district court here found that there was no animus. However, that was... It wasn't about misogyny. Exactly. It wasn't motivated by misogyny. Right. But the district court did not clearly err or abuse its discretion here because it did make a specific finding of selection at 1 ER 19. It said that women were the focus of the crime. And here... But he said more than that. He said the brunt of the crime was going to fall upon women. And we agree that that is not the correct standard. But he also found that women were the focus of the crime, that they were targeted, and that was supported by the defendant's admissions in his plea agreement at ER 131 that he targeted patients obtaining abortions, and those were, as the district court reasoned, necessarily women. Now, the legal standard that we think should govern here is the one that the Supreme Court announced, the but-for causation in Bostock. That was a Title VII case where the Supreme Court said, because of sex in Title VII means but-for causation. We changed that one factor, and if changing the sex would change the result, that is the but-for cause. So to go back to the question I'm sure you probably heard me ask about rape, then it seems to me your position would have to be that if somebody, there was somebody who was raping a male who was raping females and was choosing females because he wanted to rape females, not males, that would be subject to a hate crimes motivation? It would not because the guidelines have an application note that specifically excludes sexual offenses from this enhancement because that factor is already taken into account in the sexual offense guidelines. So the logic of it is you're saying that it's like a carve-out. Yes, there's a specific carve-out. I believe it's in Application Note 1 to 3A1.1 saying, don't apply to any sexual offense because that's already taken into account in the guidelines. So your argument makes this enhancement about, in some ways, makes this enhancement almost like a disparate impact versus sort of analysis as opposed to a, what we kind of think of as a hate crime, I guess. And there's definitely language in the legislative history and in the commentary about being concerned. And even the word motivation in the title, right? Like you tend to think of it like I'm going after somebody because I want to hurt them because of this characteristic. Your framing of it completely goes away from that to where is this, regardless of your motivation, is this particular person's MO having a, is it impacting this particular class of people? And it just seems a little different than what I think at least I've always thought of a hate crime in some of this language that was in the. So I understand your honest concern, but I think we have to go back to the statute, to Section 280002 of the Law Enforcement Act of 1994, where Congress directed the Sentencing Commission to create this enhancement. And Part 1 says that hate crime means a crime in which the defendant intentionally selects a victim or, in the case of a property crime, the property because of the actual or perceived race, color, religion, etc. And then in Section B, Congress directs that a sentencing enhancement be promulgated for those hate crimes. So the definition of hate crime that Congress considered here is exactly the same one that is in this guideline provision. It's that same language of discriminatory selection, not discriminatory animus. Right, which is why I pushed back in the earlier argument about whether there needs to be a finding of animus. It seems to me that what we have here is something that bakes in animus. Go back to the example, if you will. If I shoot someone of a different race, it's a horrible crime. It's not a hate crime. If I shoot someone because they're of a different race, that's a hate crime. So it seems to me that the animus, to the extent it's required in the way that you're meaning, is baked into this because of. That is the motivating factor for the selection. Exactly. Why do we have that here? Why do we have that here? We have that here for the same reason that Bostock explained. In Bostock, the Supreme Court explained that. I understand what Bostock said about forecausation counsel, but this record tells me that what the district court had in front of him was a person who was violently opposed, well, actually violently, vehemently opposed to abortion. He said that over and over again. He had his personal story about that. The judge found this wasn't about misogyny. He did say this was going to disproportionately impact women. That was an attribute. In fact, he said it's like an employment case. From that, I understood, but please correct me if you read it differently. I thought that what the judge was getting at was indeed, as Judge Van Dyck indicated, a disparate impact analysis. There was some reference to that, but the court also said if he targeted and he admitted that he targeted patients who were obtaining abortion services and those were necessarily women. In other words, a patient obtaining abortion services is inextricably intertwined with being a woman. That's exactly what the Supreme Court discussed in Bostock. It said you cannot fire a transgender or homosexual employee without discriminating because of sex. The Supreme Court also said in Bray that you can't equate hatred of opposition to abortion with hatred of women. I agree, and that's why if animus is required, we agree that's not found here. That was an animus case. Bray was an animus case where the Supreme Court said you can't equate animus against abortion to animus against women because people can have animus against abortion for other reasons. People go to this clinic who are not women. We have that in our record as well. Correct, and if that's all the defendant had admitted in his plea agreement, then we would have a problem. But he admitted in his plea agreement that he was specifically targeting patients seeking abortion, and those are only women. That's why this case is like Bostock. It's the but-for cause because if you change that one factor, if the patients were men, they wouldn't be victimized because only women can get abortions. The two are inextricably intertwined in exactly the same way they were in Bostock. So you're relying on the plea agreement admission. That's what you want me to look for, for the support. Both the plea agreement and the finding that at 1ER19 that women were the focus of the crime. Okay. If there are no other questions on the hate crime, I'll turn to the aggravated assault guideline. As Your Honor pointed out, the question is, is this an aggravated assault or a simple assault? When you look at the text and structure of the guidelines, the government submits that the conduct here, and we are only looking at the conduct here, not all assault with a deadly weapon. We're looking at assault with a dangerous weapon where the weapon was discharged. That conduct unambiguously constitutes aggravated assault, not minor assault, for two interrelated reasons. First of all, when you look at the statutory index, you see that there are a number of assault provisions that are assigned both 2A2.2 and 2A2.3. Those are offenses like 111, assault against a federal official, 112, assault against a foreign official, 351E, assault against a member of Congress, 1751, assault against presidential staff. All of those have a basic offense, and they have an aggravated offense where a dangerous weapon is used or bodily injury results. And it is clear that the aggravated assault guideline is supposed to apply to that aggravated form of the offense, even though an intent to injure is not required. That's why we believe that the gloss in Application Note 1 that only assault with a deadly or dangerous weapon where there's an intent to injure, that gloss about intent to injure does not apply because the guideline itself, when you look at the structure and text, makes clear that this conduct is covered by aggravated assault. And the second reason, when you look at the structure and offense, is one that Your Honor alluded to earlier, which is the specific offense characteristics. Those are part of the text and structure of the guidelines. And if we look at threatened use of a weapon, that can occur in both aggravated and minor assault. But discharging, actually discharging a firearm or a dangerous weapon, there's only an enhancement in aggravated assault. And that means that an aggravated assault unambiguously includes assault with a deadly weapon where that weapon is discharged. Again, we're not talking about all assaults with a deadly weapon. And I would also point out that this was not a reckless assault. The only recklessness finding that the district court made was with respect to injury. The assault itself, the firing of the gun, that was intentional. This was an intentional assault, but the court found that the defendant was reckless with respect to the risk of injury. We're talking about count two. I just want to make sure, what's the fact pattern for the crime of conviction on that date? So the aggravated assault guideline can apply based on relevant conduct. Unlike the... Yes, but if you could answer the question, it would be helpful to me. So the count of conviction was the May 7th. That was the date on which he was arrested. He sprayed fire at windows, doors. That's not the specific date on which the manager was standing at the window. Was there anybody outside on that day? The record does not reflect that there was anybody specifically outside on that day. But as I said, the aggravated assault guideline applies based on relevant conduct. And the relevant conduct would include all 11 incidents, including the day that he almost hit somebody on the porch and the day that the manager was window struck. I mentioned those two incidents because those are the two that I have in my notes. Those are the two that were, I think, discussed in the briefing. Are there other incidents among those 11 that we should be considering? Well, the record also shows that before the plexiglass was replaced, those windows were all shattered by the first three incidents. Now, I don't know that the record necessarily reflects that a person was standing at the window at that exact time. Okay. I've taken, again, taken quite a lot of your time. But did you want to address the obstruction? So the court found at 1 ER 28 that the defendant attempted to obstruct the FBI's investigation of firearms by lying and making false statements. And at 1 ER 23, the court identified that statement, that the guns were part of the mother's estate, and that he gave a false account of what happened to the guns. Can I cut to the chase? Sure. Hypothetically, if I were to think that he was untruthful or certainly misleading during that transcript that we have, then what about materiality on the back end? So materiality means if believed was this capable of influencing. Do we need a finding of materiality? You do not need an explicit finding. As we've argued, explicit findings are only required based on trial testimony. Generally, an enhancement doesn't require specific fact finding. Dunnegan carved out that special requirement based on trial testimony because of concerns about not impinging upon the defendant's right to testify. So we don't think a specific finding is required. The record just needs support. And here it does because the defendant was asked both general and specific questions during this interview. And he was specifically asked, there are a number of guns registered to you in California. Four of them we know you sold at the consignment shop, but we're asking you about the other five that we're still looking for and we haven't located. And he specifically lied about those, including the one that he had transferred. So it was by pure happenstance that the neighbor to whom he gave these guns saw publicity and came forward and turned those guys over to the police. How did he obstruct? Does the record show us that this actually obstructed? I would submit there's actual obstruction because there was a delay in finding the firearms that the neighbor had, and some of the firearms have never been found at all, of those firearms that he was asked about that are registered to him. So I would submit there's actual obstruction, but certainly materiality. Some of the firearms were never found. That part, he moved out of state between the time he registered those firearms. Is that right? And then he moved it. He was in Arizona or something like that for part of the time? I don't recall that, Your Honor. I thought I saw that he was. I thought his offense, his felony, was actually in Arizona maybe. That's true. That's true. He acquired the firearms. Because, you know, if you purchase a firearm here in California and you have to register it, right, but then you move to a state where to sell a firearm, you don't actually have to do anything. You're just a private, like in Arizona. He could have sold those firearms or gotten rid of them in Arizona because he said that at some point that he had gotten rid of some of the firearms. So I don't know how we could draw the inference that for any of the firearms that aren't accounted for that he necessarily still has them somewhere or something like that. He said he got rid of them. So he could have gotten rid of them if he was out of the state. And he could have done that legally. But we know that he didn't get rid of them, that he gave them to his neighbor. Well, some of them we do. But you're going off of that list. You're going off and you're saying, well, some of them he gave to a neighbor, but we don't know about other ones. And those are all ones that the reason you even know about them is because they were originally registered years ago in California. But now he no longer has them. I see your point. He says he no longer has them. But all I'm getting at is I think that there may be a lawful way for him to have no longer had them. In other words, there would have to be a record of the fact that he had sold them if he sold them somewhere other than in California. And so I don't know that we can draw the inference from that that the fact that some of these guns are unaccounted for necessarily means that he was lying or anything. I understand your point. And granting that point, he was also asked at the end of the interview, but if you are a felon, you can't possess firearms. And he said, I don't have any firearms. That was a lie. He gave eight firearms to his neighbor. Well, it's a lie if he understood. He's not a lawyer, right? So he may think that, like, by giving them to his neighbor, he doesn't possess the firearms anymore. That wasn't the finding that the district court made, and the district court's finding was not clearly erroneous. We've taken you well over your time, but I just want to follow up on something you said a minute ago. You said there was, when I asked about the obstructive conduct, where was the actual obstruction or delay, and you said there was delay in learning about the other firearms that he had given to the neighbor. I'm looking for that in the record. I've been looking for that in the record. I don't see it. I don't know what caused the neighbor to come forward. What the government represented was that the neighbor came forward because he saw publicity about the federal charges, and after that he came forward. Okay, yes, but what the record shows is that he's indicted federally, right? The FBI agent interviewed him, I think, proximate, although that's a little hard to nail down as well, but assuming that he was interviewed very promptly. And then the next bullet point in the timeline is that the neighbor came forward in response to publicity. So how did the statements he made, if I accept that they are, if I find them to have been false or misleading, how did that delay the neighbor from coming forward? Well, it delayed the government from learning about this until the happenstance of the neighbor coming forward. That would be the instruction. So if he had been truthful, is that what you mean? If he had been truthful in the conversation, they would have known about it, and, in fact, they didn't know about it until the neighbor came forward. Exactly. Okay. Anything further? All right, thank you for your argument. Thank you. I'll be brief, Your Honors. Regarding the hate crime enhancement, but-for causation is not an issue in this appeal. Bostock did nothing to undermine the Supreme Court's clear holding in Bray, which basically says that opposition to abortion cannot be equated with opposition to women. That is a narrow issue under which the Court could resolve this case. The-I want to just quickly address the hypothetical about the sex offense, too. We think that the government's interpretation would yield totally absurd results. You know, it would basically, you know, permit the enhancement to apply to a doctor stealing the identity of disabled Medicare patients, smuggling an unlawful alien, a pastor who takes advantage of their position to solicit donations from their congregation to bribe an official, thus selecting victims because of religion. It is very troubling, especially for an enhancement of this nature. It requires a reasonable doubt showing that-the breadth under which the government is interpreting the provision. So regarding the assault, the aggravated assault issue, the statutory index does cleanly resolve this issue, but not in the way that the government is claiming that it does. A3, under 113, the only provision that is in the statutory index for that is 2A2.2. That is the intent to injure with a dangerous weapon. And for A6-A5 convictions, the only provision is 2A2.3. That, under the logic of the D.C. Circuit's decision in Sargent from last week, resolves this issue. The guidelines have been interpreted the same way since the 1980s with regard to this issue. The government's attempt to sort of shoehorn in a different interpretation to the specific offense characteristic cannot be supported under the statutory index, as well as this court's decision in DAEA, which has-where the court held that otherwise using a dangerous weapon requires an intent to injure. So under basically even the government's methodology, the enhancement cannot be applied to Mr. Chamberlain's conduct. Thank you for your argument. Thank you both. Thank you. For your argument. No further questions? Did I jump the gun? Okay, guys, look, there are no further questions. Thank you, Your Honor. Thank you. We'll take that under advisement.
judges: TASHIMA, CHRISTEN, VANDYKE